**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **INTERCONTINENTAL GREAT BRANDS LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 13 C 321** |
| | ) | |
| **KELLOGG NORTH AMERICA COMPANY, KELLOGG USA INC., KEEBLER COMPANY, KEEBLER FOODS COMPANY, and KELLOGG SALES COMPANY,** | ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Intercontinental Great Brands LLC (IGB, formerly Kraft Foods Global

Brands LLC) sued Kellogg North America Company, Keebler Foods Company, and

affiliates (collectively referred to as Kellogg), alleging that Kellogg manufactures

products that infringe U.S. patent number 6,918,532 B2 (the '532 patent).  Kellogg has

moved for summary judgment of non-infringement and invalidity of the '532 patent.  IGB

has moved for summary judgment on Kellogg's defense of unenforceability and various

validity-related points.  For the reasons stated below, the Court grants IGB's motion in

part, denies Kellogg's motion claiming non-infringement, but grants summary judgment

of invalidity in favor of Kellogg, finding the '532 patent obvious under 35 U.S.C. § 103.

**Background**

Both parties market cookies in resealable containers.  IGB sells Oreos and Chips

Ahoy, among other cookies, in its resealable container (referred to as the Snack 'n Seal), and Kellogg sells Sandies and Simply Made, among others.   IGB owns a patent for its package, titled "Resealable Food Container," which was issued July 19, 2005.[1] The patent lists Kraft Foods Holdings, Inc., as the patent's exclusive licensee.

In October 2007, Regath HB, a patent holding company for Macfarlane Group Sweden, a company that produces resealable packages, requested an ex parte reexamination of the '532 patent.  The U.S. Patent and Trademark Office (PTO) granted the request.  In April 2010, the PTO issued a rejection of the '532 patent claims.  IGB (then Kraft Foods Global Brands LLC) appealed the decision to the Board of Patent Appeals and Interferences.  The Board reversed, finding that the claims were patentable.  On October 25, 2011, the PTO issued a reexamination certificate that left the original claims in the '532 patent intact and added claims 26 through 67.

Kellogg developed its resealable container in 2010.  Its package was designed to "circumvent[] the Kraft patent while maintaining similar properties."  Pl.'s Ex. 19 at KELLOGG010055.  IGB sued Kellogg on June 16, 2013, alleging that its cookie container infringes multiple claims of the '532 patent, including independent claims 1 and 34, dependent claims 3, 4, 6, 26, 32, 33, and 42 (which depend from claim 1), and dependent claims 35, 36, 37, and 39 (which depend from claim 34).

Independent claim 1 of the '532 patent reads:

1.      A polygonal shaped food container comprising:

---

[1] Although there is some dispute about whether the '532 patent actually covers the Oreos and Chips Ahoy packages that are currently used by IGB, the Court need not weigh in on this question for purposes of the summary judgment motions.

a frame defining the polygonal shape of the container, said container having a top, a bottom and sides connecting the top and bottom, the frame containing a food product comprised of discrete food articles;

a wrapper surrounding said frame, said wrapper forming the top sides and bottom of the container;

said top having an access opening sufficiently large to provide hand access to substantially all of the discrete food articles contained within the frame, such that substantially any one of the discrete food articles can be accessed and removed individually through said access opening; and

a sealing layer, adhesively sealed to said top around said opening, said sealing layer including a starter portion located near a side of the top which can be grasped by a user, said sealing layer being releasable when said starter portion is pulled in a direction away from said side to in turn pull and thereby release at least a portion of said sealing layer to provide the hand access to said top access opening and reclosable against said top to seal said opening when said sealing layer is moved back against the said top.

'532 Patent, col. 5:29–51. Claim 34 reads:

34.     A polygonal shaped food container comprising:

a frame defining the polygonal shape of the container, the frame having a bottom, sides and an upper periphery portion, the frame containing a food product comprised of discrete food product articles;

an overwrap encasing the frame, the overwrap forming an overwrap top, overwrap bottom and overwrap sides of the container over the frame and defining the top, bottom and sides of the container, the overwrap top having at least a pair of facing overwrap perimeter portions inward of the periphery portion of the frame;

the overwrap top having a reclosable access opening defined at least in part by the perimeter portions, the opening sufficiently large to provide hand access to substantially all of the discrete food articles contained within the frame such that substantially any one of the discrete food articles can be accessed and removed individually through the reclosable access opening, the upper periphery portion of the frame supporting the overwrap perimeter so that the overwrap perimeter portions are in a plane generally parallel to the bottom of the frame, the overwrap perimeter portions capturing the frame in the encasing overwrap to guard against unintentional removal of the frame through the opening from the encasing overwrap; and

a sealing layer adhesively sealed to the overwrap top around the recloseable access opening, the sealing layer including a starter portion located near a side of the overwrap top which can be grasped by a user, the sealing layer being releasable when the starter portion is pulled in a direction away from the side to in turn pull and thereby release at least a portion of the sealing layer to provide hand access to the recloseable access opening and recloseable against the overwrap top to seal the access opening when the sealing layer is moved back against the overwrap top.

Ex Parte Reexam. Certif., col. 1:57–2:24.

On September 22, 2014, the Court entered an order construing certain disputed claim terms. The parties then cross-moved for summary judgment. The Court heard argument on the parties' summary judgment motions on June 26, 2015.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the record in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, we review cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

4

## A.    Obviousness

Kellogg has moved for summary judgment of invalidity on the grounds that the patent is anticipated under 35 U.S.C. § 102 and is obvious under 35 U.S.C. § 103. IGB has moved for summary judgment on, among other things, Kellogg's defense that the claims do not contain a sufficient written description under 35 U.S.C. § 112. Because the Court concludes that the asserted claims are obvious, the Court will not discuss anticipation or written description.[2]

Patent claims are invalid as obvious under 35 U.S.C. § 103(a) when the differences between the subject matter sought to be patented and the prior art are such that the invention would have been obvious to a person having ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103(a) (2006). The Court must consider four factors to determine whether claims are invalid as obvious: (1) the "scope and content of the prior art;" (2) "differences between the prior art and the claims at issue;" (3) "the level of ordinary skill in the pertinent art;" and (4) "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others." *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966). A prima facie case of obviousness is established if the prior art references "[i]n combination . . . teach all of the limitations of the claims" and a person of ordinary skill in the art would combine the elements to create the invention. *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303–04 (Fed. Cir. 2010). Even if the prior art combines to support a prima face case of obviousness, the Court must also

---

[2] Because the application for the '532 patent was filed prior to the effective date of the America Invents Act, the earlier, pre-Act version of section 103 applies. *See* Leahy–Smith America Invents Act, Pub. L. No. 112–29 (2011); *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 857 n.1 (Fed. Cir. 2015).

consider objective evidence of non-obviousness—"secondary considerations," as they are called. *Id.* at 1305.

As the Supreme Court has stated, "when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). A patent is invalid if a person of ordinary skill in the art can implement a predictable variation of existing prior art or if he would recognize that a technique used to improve one product would improve similar products in the same way. *Id.* at 417. Because "[t]he ultimate judgment of obviousness is a legal determination" based on underlying fact findings, summary judgment of invalidity is appropriate when "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors." *Id.* at 427; *see also Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011).

### 1. Deference to the PTO

Patent claims are presumed valid, and thus "an accused infringer must prove invalidity by clear and convincing evidence." *Tokai Corp.*, 632 F.3d at 1367. In addition to the presumption of validity afforded to patented claims, "a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the U.S. Patent and Trademark Office." *Id.* Put differently, "[w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly

done its job." *PowerOasis, Inc. v. T–Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008).

During reexamination, the patent examiner was presented with the 2002 *Machinery Update* article that is the main prior art reference that Kellogg now cites to support invalidation; indeed, the examiner wrote his initials next to that article's listing. *See* Pl.'s Ex 25 at KFGB0000419. But his decision rejecting the patent claims as obvious did not mention *Machinery Update*. *Id.* at KFGB0000743–759. This was probably because, when granting reexamination, the examiner stated that "*Machinery Update* [ ] is substantially equivalent to the disclosure of *Packaging News*," a 2001 article in a trade journal. *Id.* at KFGB0000413. But *Packaging News* and *Machinery Update* are not substantially the same. Both articles describe a resealable food package called the Re-Seal It system (also known as the Fuji Package). The *Packaging News* article says that the Re-Seal It system "operates *without* conventional wrapping film," whereas the *Machinery Update* article says that "[t]he Re-Seal It system operates *with* conventional wrapping film." *Compare* Defs.' Ex. 34 at KELLOGG000518, *with* Defs.' Ex. 13 at 60 (emphasis added). According to Kellogg, the statement in *Packaging News* was a misprint. Although IGB claims that "[t]here is no evidence of any misprint in *Packaging News*," the record contradicts this. Pl.'s Mem. in Supp. of Cross Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. at 43. The *Packaging News* article includes an image that appears to show wrapping film, and the text states that the technology "allows flow-wraps of bacon, sliced cooked meat, cheese and similar food products." Defs.' Ex. 34 at KELLOGG000518. This suggests, contrary to IGB's assertion, that the article's statement that the system operates "without"

conventional wrapping film is a misprint.

Regardless of whether the *Packaging* News article contains a misprint, it is undisputed that the Board, in its opinion reversing the examiner's finding of obviousness, did not consider *Machinery Update*. Pl.'s Ex. 25 at KFGB0001645–1647 (listing the "prior art relied upon by the Examiner in rejecting the claim" and the issues presented for review). Instead, the Board considered *Packaging News*. Based on the statement in *Packaging News* that the Re-Seal It package did not have conventional wrapping film, the Board concluded that the article teaches *away* from using a wrapper surrounding a frame. *Id.* at KFGB0001652–1655 ("This teaching by *Packaging News* which specifically 'operates without conventional wrapping film' (FF 2B) would lead a person of ordinary skill in the art away from using a wrapper surrounding a frame"; "[T]he Examiner's articulated rationale [for rejecting the claims as obvious] does not appear to account for the fact that *Packaging News* teaches to not utilize conventional wrapping film (FF 2B) and that its mere use of a tray in conjunction with flap/label would lead a person of ordinary skill in the art away from using a wrapper surrounding a frame, and in a divergent direction than that taken by the applicant of the '532 patent."). Based primarily on the conclusion that a wrapperless version of the Re-Seal It package taught away from combining the elements, the Board declared the patent valid as non-obvious. *Id.* at KFGB001652–56.

Because the Board of Patent Appeals and Interferences did not consider *Machinery Update*, there is no enhanced presumption in this case. "An added burden of deference to the PTO is not required [ ] with respect to invalidity arguments based on evidence that the PTO did not consider." *Tokai Corp.*, 632 F.3d at 1167.

### 2.    The level of ordinary skill in the pertinent art

The parties do not dispute the level of ordinary skill in the pertinent art.  Kellogg's expert characterizes a person of ordinary skill in the art as someone with "at least a bachelor's degree in mechanical engineering or packaging design and several years of practical experience designing packages," or someone with "a degree in a related field such as chemistry or chemical engineering and significant practical experience designing packages."  Defs.' Mem. in Supp. of Mot. for Summ. J. at 43.  IGB's expert stated that defendants' description was not "substantially different from my own opinion regarding a person of ordinary skill in the art."  Pl.'s Ex. 27 at 16–17.

### 3.    Content of the prior art and comparison with claims 1 and 34

IGB claims April 16, 2003, the day the patent application was filed, as the date of invention, so the Court considers the state of the prior art at that date.  IGB does not dispute that resealable packaging and trays surrounded by a flow-wrapped wrapper or overwrap were available before the priority date.  Pl.'s Resp. to Defs.' LR 56.1(a) Stmt. ¶¶ 28, 30.  Although Kellogg highlights five items of prior art, the Court focuses on two articles published in *Machinery Update*, a trade journal—one published in September/October 2001 and the other published in March/April 2002.[3]  Defs.' Ex. 13, 33.  The articles describe and depict variations of the Re-Seal It system.  IGB concedes that "*Machinery Update* is legal prior art and may be considered by the jury for

---

[3] The Court does not consider the other four prior art references cited by Kellogg.  The parties dispute whether one reference, the sample of the Re-Seal It technology (also referred to as the Fuji Package), can constitute prior art.  The Court does not address this question.  As for the others, Fuji Seal and Kao are foreign patent applications for wet wipes containers.  There is a triable dispute regarding whether a person skilled in food packaging would look to features of wet wipes packaging.  Unitka is a Japanese patent application that teaches a package for microwaving foods.  There is a triable dispute regarding whether this container includes a resealable function.

anticipation and obviousness." Pl.'s Mem. in Supp. of Cross Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. at 16.

The Court primarily considers the 2002 article. The 2002 article describes the Re-Seal It system, which "allows flow-wraps of bacon, sliced cooked meat, cheese and similar food products that are consumed over a period of time to be opened, then reclosed to avoid drying out in the refrigerator." Defs.' Ex. 13 at 60. The system can also "be used for trays of high value prepared food such as sushi or canapés." *Id.* The Re-Seal It system operates "with conventional wrapping film," which is cut "to produce a flap." *Id.* "A filmic label with peelable adhesive is then applied over the flap." *Id.* "A small non-adhesive area at one end of the label provides a pull point," which consumers pull to open the container. *Id.* "To reclose the pack, the label is wiped back into place, held by the peelable adhesive which . . . has been specially formulated to grip through fat and product residues." *Id.* The 2002 article includes an image of the package containing sliced meat. *Id.* at 59. The 2001 article shows a photograph of the container holding sushi. Defs.' Ex. 33 at 46.

There is no genuine dispute that the *Machinery Update* articles disclose all of the limitations recited in claims 1 and 34, with the exception of the "frame" limitation. With respect to claim 1, the *Machinery Update* articles describe the following limitations: a polygon container, covered in overwrap, a sealing layer sealed to the top, that can be opened using a starter portion and reclosed after use, with a large enough opening for hand access to discrete food articles. Defs.' Ex. 13 at 59–60. IGB argues that the 2002 article does not disclose a top with "an access opening sufficiently large to provide hand access to substantially all of the discrete food articles contained within the frame,"

10

because the container depicted holds sliced meat that is stacked and accessed individually from a small opening. But the article also states that the package can be used for sushi or canapés, which are unquestionably discrete food articles. As to the size of the opening, the 2001 article depicts sushi packaged in a Re-Seal It container with an access opening on the top that is clearly large enough for hand access to all of the sushi pieces. IGB argues that when used with sushi, the access opening is not just on the top—rather it wraps around the side of the package. The 2002 article states that "the aperture can extend around the edge of the pack itself, allowing trays of product to be easily removed for serving and then returned to the pouch for storage." Defs.' Ex. 13 at 60. Thus, although the aperture "can" extend around the side, it does not necessarily extend around the side. In fact, the image of the package containing sliced meat has an opening only on the top. All of the required elements of claim 1 are therefore depicted or described in the *Machinery Update* articles, with the exception of the "frame" requirement.

The Court construed the term "frame" to mean "a tray with a bottom and sides." 9/22/2014 Order at 9. The article says that the Re-Seal It can be used on "trays of high value prepared food such as sushi or canapés," but it is not clear that the tray has sides. Defs.' Ex. 13 at 60.[4] Thus, there is a genuine dispute regarding whether *Machinery*

_____

[4] There is some dispute about how "frame" should be construed if the Court were to conclude that the frame in one of the prior art references has sides. Although the Court assumes that the tray in *Machinery Update* does not have sides, the specification and claims suggest that a tray with very shallow sides cannot be considered a "frame." Under those claims, the frame must "defin[e] the polygonal shape of the container." '532 Patent, col. 5:39; Ex Parte Reexam. Certif., col. 1:58. Additionally, "[t]he purpose of the present invention is to provide a new and improved container for food products such as rigid food articles . . . , which container provides adequate protection for the contents thereof . . . ." '532 Patent, col. 1:39–44. The specification also says that the

*Update* discloses a frame.

Claim 34 recites essentially the same structure as claim 1, with a few additional limitations. Specifically, the frame under claim 34 must have "a bottom, sides and an upper periphery portion," and "the upper periphery portion of the frame [must] support[] the overwrap perimeter so that the overwrap perimeter portions are in a plane generally parallel to the bottom of the frame, the overwrap perimeter portions capturing the frame in the encasing overwrap to guard against unintentional removal of the frame through the opening from the encasing overwrap." Ex Parte Reexam. Certif., col. 1:59–60, 2:7–13. Additionally, the container must have "an overwrap encasing the frame . . . defining the top, bottom and sides of the container, the overwrap top having at least a pair of facing overwrap perimeter portions inward of the periphery portion of the frame."[5] *Id.*, col. 1:62–67. Additionally, the reclosable access opening on the top must be "defined at least in part by the perimeter portions." *Id.*, col. 2:1–2.

*Machinery Update* does not disclose a frame, so it obviously cannot disclose an upper periphery portion of the frame that supports the overwrap or defines the polygonal shape of the container. During argument, IGB's counsel explained that the "facing overwrap perimeter portions" are the part of the top that extends over the frame that holds the frame in place. 6/26/2015 Tr. at 31–32; *see also* Pl.'s Ex. 35 at KFGB0000624 (diagramming, in a submission to the PTO depicted below, the perimeter portions (either B or C) and the upper periphery portion (A)).

---

invention "provid[es] a suitable container for such food products." *Id.*, col. 1:45–46. This indicates that the sides must be deep enough to completely cover and protect the food inside.

[5] The Court ruled that the term "overwrap" in claim 34 is essentially a synonym for "wrapper" as used in other claims in the patent. 9/22/2014 Order at 10–11.



Fig. 2

Fig. 3

Pl.'s Ex. 35 at KFGB0000624.

In the images from *Machinery Update* that were provided to the Court—the images of the container holding sliced meat and sushi—both packages include facing perimeter portions that are parallel to the bottom. The image of the package containing meat, shown below, clearly depicts facing perimeter portions. Although the image of the sushi package is not clear, that package must have parallel perimeter portions on the top, because otherwise the sealing layer would have nothing to stick to.

IGB again contends that the opening wraps all the way around the side for discrete food items like sushi. Thus, IGB says, even if there are facing perimeter portions on the top, the tray can be unintentionally removed in that embodiment, which means the perimeter portions do not "captur[e] the frame in the encasing overwrap to guard against unintentional removal of the frame." As the Court has discussed, the 2002 article simply states that "the aperture *can* extend around the edge of the pack itself, allowing trays of product to be easily removed for serving." Defs.' Ex. 13 at 60 (emphasis added). The Re-Seal It system does not require an opening that extends around the side of the container. In fact, the image of the Re-Seal It packaging

13

containing stacked meat only includes a top opening. *Id.* at 59. If a frame were included in that package, it would be impossible to unintentionally remove it through the top opening. Accordingly, it is not genuinely disputed that the two *Machinery Update* articles disclose every limitation of claims 1 and 34, with the exception of the frame.



Image from *Machinery Update* (2002)
Defs.' Ex. 13 at 59.



Image from *Machinery Update* (2001)
Defs.' Ex. 33 at 46.

Frames for discrete food items like cookies unquestionably existed in the prior art. For instance, the Graham stackable cookie package and tray, which was presented to the PTO during reexamination, discloses "a cookie package 'including an open-topped cookie tray . . . [which] provides support ribs effectively for contacting cookies at spaced points[,] for so spacing the cookies, and for resiliently cushioning the cookies against shock and stacking loads.'" Pl.'s Ex. 25 at KFGB0001053 (quoting Graham, col. I, II. 11–12, 18–21; Third Cornell Decl., ¶ 15).[6]

---

[6] The Graham package was one of the prior art references cited by the examiner when he invalidated claims 25 through 46 as obvious during reexamination. Pl.'s Ex. 25 at KFGB0001646. Graham was also considered by the Board of Patent Appeals and Interferences, although the Board concluded that it would not have been obvious to



Pl.'s Ex. 25 at KFGB0001649 (reproduction of Figure 2 of the Graham patent).

Additionally, in its submissions to the PTO, IGB included images of the previous Oreos package, which was described by one consumer as "inspiration for how to NOT handle usability . . ." *Id.* at KFGB000552. Those images show a frame that extends to support the overwrap and protect the cookies, which also forms the shape of the polygonal container. All of the independent claim limitations existed in the prior art at the time of invention; traditional cookie trays meet the "frame" limitation and *Machinery Update* discloses the other claim limitations.

### 4. Motivation to combine

The parties primarily dispute whether one skilled in the art would be motivated to combine the prior art elements. The Supreme Court and Federal Circuit have articulated a flexible approach to determining whether there was a motivation to combine the prior art at the time of invention. *See KSR*, 550 U.S. at 415–16; *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010). When a technology is simple,

---

combine Graham with *Packaging News* because *Packaging News* teaches away from the use of conventional wrapping film. *Id.* at KFGB0001655.

the Court's obviousness analysis "may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009).

In assessing obviousness, the Court can combine the different features of the Re-Seal It system as they are depicted and described in *Machinery Update*, if someone skilled in the art reading the articles would think to combine them. *See, e.g., Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1321 (Fed. Cir. 2005). The container for stacked meats was described *on the same page* as the container for sushi and canapés. Defs.' Ex. 13 at 60. The purpose of the article, which was published in a packaging journal, was to introduce food packaging experts to the Re-Seal It system and its varied potential uses. Based on this undisputed evidence, no reasonable jury could conclude that a person skilled in the art would not think to combine the features of the Re-Seal It food package that were disclosed in the article—including the top opening of the meat container and the tray of the sushi container.

IGB argues that a person of skill in the art would not be motivated to combine a cookie tray with a resealable package like the container described in *Machinery Update*. The Federal Circuit has held that "where all of the limitations of the patent were present in the prior art references, and the invention was addressed to a known problem, *KSR* . . . compels the grant of summary judgment of obviousness." *Wyers*, 616 F.3d at 1240 (internal quotation marks and citations omitted). Here, all of the limitations were present in the prior art, and the problem that the invention was designed to solve was known to those skilled in the art. The invention was created to remedy a problem with existing

cookie containers, namely that they did not "provide a convenient opening and reclosing arrangement." '532 Patent col. 1:19–20.  Kraft's submissions to the PTO also show that the lack of a resealing function on cookie packages was a known problem.  Kraft wrote:

> With current overwrapped trays, consumers struggle to gain access to the product as the end seals are hard to open, and the tray is very hard to get in and out of the flow wrap, resulting in film tearing.  This doesn't allow the package to be effectively reclosed, resulting in its contents losing freshness, and consumers then often resorting to repackaging the product.  Snack 'n Seal eliminates this hassle, as the package is easy to use and keeps cookies fresh longer, eliminating the need to repackage.

Pl.'s Ex. 25 at KFGB0000477.  Additionally, IGB presented consumer complaints about Oreos' previous packaging.  *See id.* at KFGB0000552; Pl.'s Ex. 22 at KFGB0003854 (summary of the results of a June 2003 Kraft study, which revealed "that consumers are somewhat dissatisfied with current snack food packaging," because "bags tear during initial opening and are hard to reseal, [i]t is difficult to place cookie/cracker trays back in the bag, [and s]nacks do not stay fresh").  Moreover, Kellogg had also recognized the problems associated with traditional cookie packages "[i]n the early 2000's."  Pl.'s Claim Const. Br. at 3; *see also* Pl.'s Ex. 30 at 324 (Kellogg's 30(b)(6) witness, stating that Kellogg had interest in a resealable container for cookies prior to 2004).

In sum, there was a known problem in the cookie packaging industry, and all of the elements of the invention existed in the prior art.  A packaging expert, with knowledge of existing food packaging technology, would have thought to combine a resealable container and a frame big enough to contain cookies.  This combination "would have been entirely predictable and grounded in common sense."  *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 992–93 (Fed. Cir. 2009); *see also Perfect Web Techs.,* 587 F.3d at 1330–31 (affirming district court's grant of

summary judgment of obviousness). No reasonable jury could conclude that a person skilled in packaging design would not be motivated to combine these features.

According to IGB, it would have been counterintuitive to a person of ordinary skill to cut a hole in the top of a cookie container. IGB claims that consumers and competitors were skeptical of the Snack 'n Seal technology when it was first released, which it says shows that the invention was counterintuitive. But the evidence that IGB cites does not actually support that point. A June 2003 presentation prepared by Kraft discussing the results of a consumer survey stated that only three percent of survey respondents found the resealable pull back lid to be "not at all believable." Pl.'s Ex. 22 at KFGB0003889. In fact, another part of the same report said: "consumers like this idea [of a resealable pull-back lid] and are familiar with the concept as it is available in the cleaning and personal care categories (i.e., wipes)." Pl.'s Ex. 22 at KFGB0003862. Far from suggesting that consumers received the idea of a resealable cookie container with skepticism, it appears that they embraced it as a solution to an existing problem. IGB also cites a February 2003 e-mail attachment listing consumer comments, including the following: "Resealable Newtons: good idea, needs to seal well, opening needs to be bigger." Pl.'s Ex. 23 at KFGB0003958. Again, this comment suggests positive initial reaction and contradicts IGB's argument that it would be counterintuitive "to cut a giant hole in the top of the cookie container." 6/26/2015 Tr. at 30. IGB points to one piece of evidence suggesting consumer skepticism. Kellogg's Rule 30(b)(6) witness commented during his deposition, "As we tested the Snack 'N Seal, it went from very much skepticism on the part of consumers, and as it was in the marketplace for a longer period of time, became more familiar with the consumers, it became the package that

was acceptable to them."  Pl.'s Ex. 30 at 323.  The witness did not elaborate on this point, although his earlier statement that Kellogg had been interested in a resealable cookie package for years contradicts the notion that consumers were skeptical about resealable containers.  *Id.* at 312–313, 324.  Although IGB cites evidence that supports the inference that its competitors were skeptical that packaging could drive consumption, there is no evidence from which a reasonable jury could conclude that it would be counterintuitive to combine a resealable container with an opening on the top and a cookie tray.

Although IGB's expert has offered a report in which he concludes that the claims are not obvious in light of *Machinery Update*, the report does not create a genuine issue of material fact.  First, IGB's expert states that "there is no common theme running from one part of *Machinery Update* to another" that would explain why "features from one package would have been combined with those of another package."  Pl.'s Ex. 27 at 51.  (IGB's expert focused exclusively on the 2002 *Machinery* Update article.)  But the article itself clearly suggests that the features of Re-Seal It packages can be combined, by stating that the same package shown with stacked meats can also "be used for trays of high value prepared food such as sushi or canapés."  Defs.' Ex. 13 at 60.  No reasonable jury would believe that a food packaging expert reading that article would not think to combine the versions of the Re-Seal It system described.  Second, IGB's expert points out that the patent applicants "distinguished prior art packages for storing sliced food items" from their invention designed for discrete food items.  According to IGB's expert, "applicants made clear during prosecution that their invention was distinct from prior art package for food, such as those disclosed in *Machinery Update*."  Pl.'s Ex.

27 at 51–52.  But the obviousness analysis does not focus on what the inventor said or did, but what a person skilled in the art would have known.  *Machinery Update* states that the Re-Seal It system is not limited to sliced food items but can also be used for discrete food items.  Thus, the representations to the PTO do not create a triable issue.

Additionally, IGB's expert states that *Machinery Update* "contains teachings that teach away from the combinations" in the invention.  *Id.* at 52.  He says that bacon, sliced meat, and cheese are all products "intended to be consumed over a period of time," but that the article "in no way suggests that sushi is a type of food that . . . should be consumed 'over a period of time.'"  *Id.*  The implication is that a person skilled in the art would not see the sushi tray and think to use the same type of package with food items consumed over a period of time, like cookies.  This, however, contradicts the Supreme Court's direction that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton."  *KSR*, 550 U.S. at 421.  If a person skilled in the art were to read the 2002 *Machinery Update* article, it would require only a minimal amount of creativity for that person to think to mix and match the features described, as the Court has discussed.

Finally, IGB's expert says *Machinery Update* teaches away from an overwrap tray that prevents unintentional removal, because the article describes an opening that extends around the side of the package.  Again, the article suggests the various features of the Re-Seal It package can be combined, and thus does the opposite of teaching away from a combination.  *Cf. In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or

would be led in a direction divergent from the path that was taken by the applicant.").

Far from "suggest[ing] that the line of development flowing from the reference's

disclosure is unlikely to be productive of the result sought by the applicant," *id.*, the

article encourages the use of the Re-Seal It system for different types of foods.

The Court concludes that IGB's expert's report does not create a genuine issue

of fact regarding the motivation to combine the features highlighted in *Machinery*

*Update* with existing cookie packages. As the Court has noted, when a technology is

simple, the obviousness analysis "may include recourse to logic, judgment, and

common sense available to the person of ordinary skill that do not necessarily require

explication in any reference or expert opinion." *Perfect Web Techs.*, 587 F.3d at 1329.

In *KSR*, the patent owner presented expert affidavits stating that the invention was non-

obvious. The Supreme Court nonetheless concluded:

> In considering summary judgment . . . the district court can and should
> take into account expert testimony, which may resolve or keep open
> certain questions of fact. That is not the end of the issue, however. The
> ultimate judgment of obviousness is a legal determination. Where, as
> here, the content of the prior art, the scope of the patent claim, and the
> level of ordinary skill in the art are not in material dispute, and the
> obviousness of the claim is apparent in light of these factors, summary
> judgment is appropriate. Nothing in the declarations proffered by Teleflex
> prevented the District Court from reaching the careful conclusions
> underlying its order for summary judgment in this case.

*KSR*, 550 U.S. at 427 (internal citation omitted). Conclusory expert statements do not

preclude a determination of obviousness where, as here, the underlying factual issues

are not genuinely disputed. *See Stone Strong, LLC v. Del Zotto Prods. of Fla., Inc.*, 455

F. App'x 964, 969 (Fed. Cir. 2011). Because there is no genuine dispute that all

elements of claims 1 and 34 are disclosed in the prior art and it would have been

predictable for a person of skill in the art to combine those elements, Kellogg has made

a strong prima facie showing of obviousness as to independent claims 1 and 34.

### 5. Content of the prior art and comparison with dependent claims 3, 4, 6, 26, 32, 33, 35, 36, 37, 39, and 42

The Court must also consider whether any of the narrower dependent claims stemming from independent claims 1 and 34 are non-obvious. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356 (Fed. Cir. 2001) ("Because dependent claims contain additional limitations, they cannot be presumed to be invalid as obvious just because the independent claims from which they depend have properly been so found."). IGB accuses Kellogg of infringing dependent claims 3, 4, 6, 26, 32, 33, and 42 (which depend from claim 1) and dependent claims 35, 36, 37, and 39 (which depend from claim 34). For the reasons stated below, Kellogg has made a strong prima facie showing that each of the dependent claims are obvious in light of *Machinery Update* and existing cookie packages.

A number of the dependent claims are essentially duplicative of one or both of the independent claims. For instance, claim 26 states:

> 26. The polygonal shaped food container of claim 1 wherein the frame has an upper periphery and the top has a pair of facing perimeter portions adjacent the access opening, the pair of facing perimeter portions extending inward beyond at least a portion of the upper periphery portion to capture the frame in the wrapper against unintentional removal through the access opening.

Ex Parte Reexam. Certif., col. 1:21– 27. This claim has substantially the same elements as Claim 34, which the Court has already discussed. Additionally, claim 39 states:

> 39. The polygonal shaped food container of claim 35, wherein the sealing layer covers substantially the entire top.

Ex Parte Reexam. Certif., col. 2:50–51. Claim 39 is essentially duplicative of the

requirement in claim 34 that the opening be "sufficiently large to provide hand access to substantially all of the discrete food articles contained within the frame . . ."  By definition, if the opening provides hand access to most of the discrete food items, the sealing later that covers the opening  and attaches to the top would cover substantially the entire top.  The difference, it would seem, is one of degree, as evidenced by use of the word "entire" in claim 39.  In claim 39, the sealing layer must cover nearly all of the top of the wrapper.  This difference is a minor one.  The image of the Re-Seal It package containing sushi clearly shows an access opening covering substantially the entire top.  Defs.' Ex. 33 at 46.

Claim 35 states:

35.     The polygonal shaped food container of claim 34 wherein the facing perimeter portions extend to additional perimeter portions extending inward of the periphery portion of the frame, the facing perimeter portions and additional perimeter portions combined to surround the reclosable access opening, and the perimeter portions all extend inward beyond the periphery portion of the frame to capture the frame in the overwrap against unintentional removal through the reclosable access opening, the upper periphery portion of the frame supporting all of the overwrap perimeter portions so that the overwrap perimeter portions are in a plane generally parallel to the bottom of the frame after the reclosable access opening is opened to expose the food product articles.

Ex Parte Reexam. Certif., col. 2:25–38.  Claim 35 recites essentially the same structure as claim 34, except that it requires, in addition to the "pair of facing perimeter portions" recited in claim 34, "additional perimeter portions extending inward of the periphery portion of the frame."  Those perimeter portions "combine[] to surround the recloseable access opening."  The meat package depicted in *Machinery Update* does not include a tray, but it does include two sets of facing perimeter portions that surround the recloseable access opening.  If a tray was added, then the tray could not be

unintentionally removed. Claim 35 also requires the "upper periphery portion of the frame [to] support[] all of the overwrap perimeter portions," which is essentially duplicative of the requirements for frames stated in claim 34 that "the upper periphery portion of the frame [must] support[] the overwrap perimeter." Ex Parte Reexam. Certif., col. 2:7–8.

Claim 42 states:

42. The polygonal shaped food container of claim 1 wherein the frame is the only support for elevating the wrapper at the top of the container.

Ex Parte Reexam. Certif., col. 2:60–62. This claim is largely duplicative of the requirement in claims 1 and 34 that the frame "defin[e] the polygonal shape of the container" and "support[] the overwrap perimeter." '532 Patent, col. 5:39; Ex Parte Reexam. Certif., col. 1:58, 2:7–8. With respect to this claim, the frame must be the "only support" for the wrapper, which means that the frame must extend above the food items and form the structure of the wrapper that surrounds the container. As the Court has stated, *Machinery Update* does not disclose a frame, but a deep frame surrounded by a wrapper already existed in cookie packaging. Thus, Kellogg has made a strong prima facie showing that claim 42 is obvious in light of the prior art.

Claim 3 states:

3. The polygonal food container of claim 1, wherein said starter portion comprises a tab which projects past an edge of said top at one side of the container, said tab being accessible beyond the edge to be grasped.

'532 Patent, col. 5:56–59. *Machinery Update* discloses a starter portion tab on the top that can be grasped. Defs.' Ex. 13 at 60 ("A small non-adhesive area at one end of the label provides a pull point.").

Claim 4 states:

> 4.      The polygonal shaped food container of claim 1, wherein said top of the container includes graphics around said opening, and said sealing layer includes graphics which match the graphics on said top.

'532 Patent, col. 5:60–63.  The image in *Machinery Update* clearly shows a sealing layer and top layer with matching graphics.  Defs.' Ex. 13 at 59.

Claim 6 states:

> 6.      The polygonal shaped food container of claim 1, further comprising a tamper-evident structure.

'532 Patent, col. 5:66–67.  The patent describes a "tamper-evident structure" as follows: "[T]amper-evident structure are [sic] provided in an effort to indicate whether the container [ ] has been previously opened or in some manner been tampered with."  '532 patent, col. 3:57–60.  The stacked meat container depicted in *Machinery Update* appears to include a white, black, and yellow sticker on the top at the place where the sealing layer meets the overwrap top.  The sticker appears to have been torn in half when the package was opened, and the Court can make out the other half of the sticker on the sealing layer underneath the fingers.  Defs.' Ex. 13 at 59.   Although the image is grainy, this appears to be the tamper-evident structure recited in claim 6.

Two of the dependent claims relate to dividers in the frame.  Claim 32 states:

> 32.      The polygonal shaped food container of claim 26 wherein the frame has at least one divider to separate discrete food articles.

Ex Parte Reexam. Certif., col. 1:50–52.  Claim 36 states:

> 36.      The polygonal shaped food container of claim 35 wherein the frame has a plurality of dividers extending transversely across the frame.

Ex Parte Reexam. Certif., col. 2:39– 41.  Claim 36 differs from claim 32 in that it requires more than one divider that extends from one end of the frame to another.  The

*Machinery Update* articles do not disclose dividers.  But trays with dividers were used for packaging cookies prior to the invention.  For instance, the Graham patent discloses "a cookie package . . . [which] provides support ribs effectively for contacting cookies at spaced points for so spacing the cookies, and for resiliently cushioning the cookies against shock and stacking loads.'"  Pl.'s Ex. 25 at KFGB0001053 (quoting Graham, col. I, II. 11–12, 18–21; Third Cornell Decl. ¶ 15).  The image of the Graham cookie tray clearly shows dividers, including dividers that traverse the frame.  *Id.* at KFGB0001649.



Pl.'s Ex. 25 at KFGB0001649 (reproduction of Figure 2 of the Graham patent)

For the reasons the Court has stated, it would have been predictable for a packaging expert to combine a cookie tray, like that used in the Graham package, with the resealing technology in *Machinery Update.*

Two of the dependent claims require the package to contain cookies and the package and overwrap to protect the cookies from damage.  Claim 33 states:

> 33.    The polygonal shaped food container of claim 26 wherein the discrete food articles are cookies susceptible to damage and the frame and the wrapper cooperate to protect the cookies from damage.

Ex Parte Reexam. Certif., col. 1:53–2:24.  Claim 37 states:

37. The polygonal shaped food container of claim 36 wherein the discrete food articles are cookies susceptible to damage and the frame and the overwrap cooperate to protect the cookies from damage.

Ex Parte Reexam. Certif., col. 2:42– 45. The *Machinery Update* articles do not disclose this claim. They do not describe or depict a frame that would protect cookies from damage. But as the Court has stated, cookie trays designed to protect cookies (like the Graham package) existed in the prior art, and it would have been predictable for one skilled in the art to combine existing cookie trays with resealable packaging technology described in *Machinery Update.* Thus, Kellogg has made a strong prima facie showing that these claims are obvious.

In sum, Kellogg has made a strong showing that the additional structural limitations recited by the dependent claims are obvious. They simply recite features that were common in previous cookie packages or disclosed in *Machinery Update*. As the Court has explained, it is not genuinely disputed that it would have been predictable for one skilled in the art to combine these features.

## 6. Secondary considerations

Although Kellogg has made a strong prima facie showing of obviousness based on the primary considerations, the Court must also analyze secondary considerations of non-obviousness, such as commercial success, long felt but unsolved needs, failure of others, copying, and unexpected results. *KSR*, 550 U.S. at 406; *Wyers*, 616 F.3d at 1245. IGB has presented substantial evidence of secondary considerations of non-obviousness.

With respect to commercial success, a Kraft study concluded that the company's sales volume increased four percent due to the Snack 'n Seal packaging. Pl.'s Ex. 25 at

KFGB0000484.  IGB also presented evidence of positive consumer feedback related to the packaging.  Additionally, a report prepared by Kellogg concluded that IGB's Snack 'n Seal "was a clear favorite for nearly all" of 42 respondents interviewed.  Pl.'s Ex. 49 at KELLOGG009409.  The report stated:  "It is evident that Nabisco's launch of its Snack 'n Seal packaging has had an impact on expectations. . . .  [S]ome [respondents] said they look for cookie products in that packaging because it is effective at maintaining freshness and easy to use."  Pl.'s Ex. 14 at KELLOGG009415.  Another report stated: "Kellogg's Snacks division has identified packaging innovations as a potentially important way to increase sales and consumption of existing snack food items, deliver improved margins/ROI, and differentiate both existing and new snack food products." Pl.'s Ex. 13 at KELLOGG009039.  IGB has offered substantial evidence from which a jury could find that its invention has been commercially successful.

IGB has also presented evidence of long felt but unsolved need.  Kraft won many awards for its Snack 'n Seal packaging, including a DuPont Award, "one of the highest industry awards innovative packaging technology can receive."  Pl.'s Ex. 25 at KFGB000475.  Additionally, many industry publications have lauded the Snack 'n Seal package, including one article that said, "The tray pack for Oreo cookies long cried for improvement."  *Id.* at KFGB0000477–0000479.

Additionally, IGB has presented compelling evidence of copying.  A document produced by Kellogg states that the company "develop[ed] technology that circumvents the Kraft patent while maintaining similar properties."  Pl.'s Ex. 19 at KELLOGG010055. This evidence shows that Kellogg intentionally copied IGB's packaging.

Even assuming these facts to be true and drawing all reasonable inferences in

IGB's favor, this is a case in which the secondary considerations do not overcome Kellogg's extremely strong prima facie showing that the invention was obvious in light of *Machinery Update*. "[S]econdary considerations of nonobviousness . . . simply cannot overcome a strong prima facie case of obviousness." *Wyers*, 616 F.3d at 1246; *see also Perfect Web Techs.,* 587 F.3d at 1333 ("[E]vidence of secondary considerations does not always overcome a strong prima facie showing of obviousness."); *Ball Aerosol*, 555 F.3d at 994 (concluding that "minimal indications of commercial success . . . do not outweigh the clear indication of obviousness apparent from the prior art"); *Tokai Corp.*, 632 F.3d at 1370. In this case, the prior art references teach all of the claim limitations—all of the elements could be found in existing food packaging technology. In fact, nearly all of the elements were found in one *Machinery Update* article, and the rest already existed in cookie packages. Additionally, the technology is relatively simple. Based on these considerations, a person skilled in the art would have a reason to combine the elements to create the invention. In sum, the primary considerations lead to a conclusion that the invention was obvious in light of the prior art, and IGB's strong showing of secondary considerations does not outweigh this determination.

In sum, based on the undisputed facts, all of the asserted claims are invalid as obvious in light of *Machinery Update* when combined with existing cookie packages. Because the asserted claims are obvious, the Court need not consider Kellogg's anticipation or written description arguments or whether the sample of the Re-Seal It technology, also referred to as the Fuji Package, constitutes prior art under 35 U.S.C. § 102(a).[7]

---

[7] Both parties moved for summary judgment on whether the Fuji Package can constitute

**B.     Non-infringement**

Although judgment in favor of defendants is appropriate because the asserted claims are invalid, the Court nonetheless considers the parties' infringement arguments. "Patent infringement is a two step inquiry.  First, the court must construe the asserted claim.  Second, the court must determine whether the accused product or process contains each limitation of the properly construed claims, either literally or by a substantial equivalent." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1356–57 (Fed. Cir. 2005) (internal citation omitted).  "The first step is a question of law; the second step is a question of fact." *Id.* at 1357.  "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the patent claims." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

Defendants are entitled to summary judgment of non-infringement as to literal infringement based on the Court's construction of the claim term, "sealing layer."  The Court concluded that the "sealing layer" as used in claims 1 and 34 must be a distinct layer from the top of the container, because "the patent specification differentiates the sealing layer from the component(s) of the container that form its top."  9/22/2014 Order

---

prior art.  It is undisputed that a sample of the package was given to a Kellogg employee at a European trade show and was shown to Kellogg employees in the United States.  The parties dispute whether the sample was "known or used by others in this country" before the date of invention under section 102(a).  35 U.S.C. § 102(a) (2006); *see also Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305–06 (Fed. Cir. 2006); *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (2008) (discussing the standard under section 102(a)).  The Court does not address this issue.

at 6–7.  Kellogg argues that the accused products do not have a sealing layer that is distinct from the top of the container.  IGB does not dispute that the accused products' purported "sealing layer" is part of the same piece of material as the top of the packaging; it is created by cutting a flap from the top of the wrapper.  Instead, IGB argues that "[b]y limiting the scope of the Court's Order on Sealing Layer to a discrete layer—meaning separately manufactured material—Defendants improperly limit the claims to the preferred embodiment."  Pl.'s Mem. in Supp. of Cross Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. at 6.  As the Court stated in the claim construction ruling, the "sealing layer" must be a distinct layer from the wrapper top. *See* 9/22/2014 Order at 5–7 ("Kellogg says that sealing layer means 'a layer of material distinct from the top of the wrapper having adhesive thereon for sealing to the upper surface of the top of the wrapper.' . . .  The Court agrees with Kellogg that the claim language requires the sealing layer to be a distinct layer from the top of the container."). In other words, the sealing layer must be a separate piece of material, although it can be made of the same type of material as the rest of the top.  Because the top and the cut-out flap are not "distinct layers" in the accused products—rather, they are part of the same layer—Kellogg does not literally infringe the sealing layer limitation.  Kellogg is therefore entitled to summary judgment of no literal infringement because, based on the undisputed facts, the accused products do not contain every limitation of the independent claims.

The Court addresses another claim construction issue raised by Kellogg, looking first and primarily to "the claims themselves, the specification, and the prosecution history of the patent."  *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d

1271, 1276 (Fed. Cir. 2013).  Kellogg argues that it is entitled to summary judgment of non-infringement because the flap on the accused product—even if it is considered a "sealing layer"—does not adhere directly to the top of the wrapper as required under both claims.  Instead, the flap adheres to an adhesive collar, which is a separate material that is affixed to the top.  IGB argues that the adhesive collar should be considered part of the top of the container.  The parties do not dispute the structure of the accused products but rather ask the Court to determine whether a material affixed to the top of the wrapper can be considered part of the top.

Under claim 1, the sealing layer must be "adhesively sealed to said top around said opening" and must be "reclosable against said top to seal said opening when said sealing layer is moved back against the said top."  '532 Patent, col. 5:42–51.  Similarly, under claim 34 the sealing layer must be "adhesively sealed to the overwrap top around the recloseable access opening" and must be "recloseable against the overwrap top." Ex Parte Reexam. Certif., col. 2:14– 24.  Nothing in the claims or specification suggests that a material affixed to the top cannot be considered part of the top.  Kellogg points to the claim language requiring that the wrapper "surround[] said frame" and "encas[e] the frame."  '532 Patent, col. 5:34–35; Ex Parte Reexam. Certif., col. 2:62.  Even though the wrapper forms the top and must surround the frame, this does not mean that the top cannot have additional material affixed to it.  The top limitation is not like the "sealing layer" term.  There, the word "layer" and the surrounding language in the claim and specification indicated that the top and the sealing layer must be separate pieces of material.  Here, no language limits "top" to exclude materials affixed directly to the top of the wrapper.  Accordingly, the Court concludes that the "top" can include materials

directly affixed to the top, such as the adhesive collar. Based on the undisputed facts, the accused product contains that limitation.

Even though Kellogg does not literally infringe because the accused product does not have a "sealing layer," Kellogg is not entitled to summary judgment of non-infringement because a reasonable jury could find that the accused product infringes under the doctrine of equivalents. The doctrine of equivalents applies when the accused product does not contain every claim limitation but nonetheless provides the same function in the same way with the same results. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). The Court "must consider the totality of the circumstances" to "determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co.*, 420 F.3d at 1358. Apart from the one material difference between the '532 patent and the accused product that Kellogg highlights—namely the different sealing layer structure—there is ample evidence from which a reasonable jury could find that the accused product is identical in structure to the patented invention. A reasonable jury could find that the accused product performs the same function as the patented invention in the same way. In fact, a document produced by Kellogg states that the company "develop[ed] technology that circumvents the Kraft patent while maintaining similar properties." Pl.'s Ex. 19 at KELLOGG010055. This undisputed evidence suggests that Kellogg intentionally altered its packaging slightly to avoid literally infringing the '532 patent. This is precisely what the doctrine of equivalents aims to prevent.

**C.    Inequitable conduct**

The Court grants IGB's motion for summary judgment on defendants' inequitable conduct defense.  To prevail on a defense of inequitable conduct of the type asserted here, "the accused infringer must prove by clear and convincing evidence that the applicant knew of [a prior art] reference, knew that it was material, and made a deliberate decision to withhold it."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc).  The intent requirement is exacting; "the evidence must be sufficient to require a finding of deceitful intent in the light of all the circumstances.  Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."  *Id.* at 1290–91 (internal quotation marks and citation omitted).  As far as materiality, absent "affirmative egregious misconduct," the failure to disclose must be but-for material, meaning "the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  *Id.* at 1291.

Defendants claim that IGB engaged in affirmative egregious misconduct by failing to point out the misprint in the *Packaging News* article.   As the Court has discussed, the article stated that the Re-Seal It technology did not include conventional wrapping film, which was almost certainly a misprint.  Not realizing this, the Board of Patent Appeals and Interferences considered that article and concluded that the article teaches away from combining the package with overwrap.  The Board did not consider the *Machinery Update* articles that described the Re-Seal It package as including overwrap.  This allegation cannot form the basis of an inequitable conduct claim, however.  It is undisputed that *Machinery Update* and *Packaging News* were presented during reexamination, and "[a]n applicant can not be guilty of inequitable conduct if the

reference was cited to the examiner, whether or not it was a ground of rejection by the examiner." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000).

Even though Kellogg does not dispute that all of the relevant articles were submitted during reexamination, Kellogg nonetheless argues that IGB's counsel committed egregious misconduct by knowingly making false statements about the *Packaging News* article during oral argument before the Board.  Kellogg points to the portion of the hearing in which one judge asked, "In looking at this photograph that's reproduced in this 'Packaging News' document, it appears that there is something on the—below the tray, meaning a wrap of some sort, that goes underneath the tray.  Is that a correct characterization?"  IGB's counsel responded:  "No, Your Honor. There's no evidence that there is any sort of surrounding wrapper."  Pl.'s Ex. 25 at KFGB0002668.  Another judge pointed to the text of *Packaging News* and asked, "What is that talking about there?  They're talking about flow wraps."  IGB's attorney responded that "they're talking about the types of foods that would have normally been flow wrapped; now they're using this new technology."  *Id.* at KFGB0002673.  Although IGB's attorney during the reexamination proceedings should have notified the Board that the *Machinery Article* described the same packaging as including conventional wrapping, he merely restated the contents of the misprinted article.  There is no evidence that the attorney knowingly failed to identify the inconsistency between the two articles.  Absent evidence of specific intent to deceive, the Court may not find the '532 patent unenforceable due to inequitable conduct.  Kellogg has pointed to no such evidence.

Defendants also claim that IGB withheld information about the Fuji Package

when it filed its patent application.  IGB offered evidence that a Kraft employee in

Germany obtained the Fuji Package at a 2001 trade show in Europe and sent an e-mail

about the package to another German Kraft employee named Ron Exner shortly

thereafter.  The inventor of the '532 patent contacted Exner to ask about prior art before

applying for the patent in 2003.  Kellogg contends that Exner had a duty to share his

knowledge of the Fuji Package with the inventor.  But in the e-mails provided to the

Court, Exner is merely copied and does not acknowledge receipt.  There is no

suggestion that Exner intended the inventor to withhold relevant prior art from the PTO.

As the Court has noted, when there are multiple reasonable inferences that may be

drawn, intent to deceive cannot be found.  *See Therasense, Inc.*, 649 F.3d at 1290–91.

Here, there are many alternative reasonable inferences that can be drawn—that Exner

did not see the e-mail, that he forgot about the e-mail, or that he did not recognize the

technology as the Fuji Package because it was described by another name, "Antonson,"

in the e-mail.  Defs.' Reply in Supp. of Mot. for Summ. J. and Opp'n to Pl.'s Cross Mot.

for Summ. J., Ex. 49 at RDINCO291215.  Moreover, the German employee's knowledge

cannot form the basis for a claim of inequitable conduct because he did not have a duty

to disclose information to the PTO.  *See* MPEP § 2001.01; 37 C.F.R. § 1.56 (listing

those with a duty to disclose information to the PTO to include named inventors, the

prosecuting attorney or agent, and others who are substantively involved in the

preparation or prosecution of the application).

## Conclusion

For the foregoing reasons, the Court grants summary judgment of invalidity in

favor of defendants on the basis of obviousness [dkt. no. 131] and grants plaintiff's

cross-motion for summary judgment in part [dkt. no. 143]. The Court directs the parties to promptly confer regarding the appropriate language for a judgment consistent with the Court's ruling. The parties are to submit a proposed form judgment or alternative proposals are to be submitted by no later than August 6, 2015.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 3, 2015.